NO. 07-07-0451-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

AUGUST 6, 2008

_____

TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
AND UNIVERSITY MEDICAL CENTER, APPELLANTS

V.

CARITA ELIZABETH WARD AND DUSTIN WARD, APPELLEES

_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2006-536,174; HONORABLE SAM MEDINA, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**OPINION**

Appellants, Texas Tech University Health Sciences Center (TTUHSC) and University Medical Center (UMC) appeal from the trial court's order denying their respective pleas to the jurisdiction in a medical malpractice suit brought by Appellees, Carita and Dustin Ward, arising from the death of their stillborn child. We reverse and render.

TTUHSC and UMC contend the Texas Tort Claims Act[1] bars the Wards' claim. In response, the Wards contend that TTUHSC's and UMC's claims of sovereign immunity are inapposite because the death of their son comes within the limited waiver of immunity provided by the Act[2] where the death is caused by a condition or use of tangible personal property, to-wit: an external fetal heart rate monitor.[3]

By two issues, TTUHSC maintains the trial court lacked subject matter jurisdiction because (1) the injury was not caused by tangible personal property and (2) the information produced by a fetal heart rate monitor is not tangible personal property. Presenting three issues, UMC contends (1) the use of information from a fetal heart rate monitor operated by its nurse does not constitute a condition or use of tangible property; (2) an improper interpretation of information from a fetal heart rate monitor is not harm caused by a condition or use of tangible property; and (3) UMC's failure to continue to monitor Carita (or take other affirmative action) was not the cause of the stillbirth of her unborn child. Accordingly, both TTUHSC and UMC contend the Wards' claim does not fall within the limited waiver of immunity created by § 101.021(2) of the Act.

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001 - 101.109 (Vernon 2005 & Supp. 2007) (hereinafter referred to as the Act).

[2]*See* Tex. Civ. Prac. & Rem. Code Ann. §101.021(2) (Vernon 2005 & Supp. 2007).

[3]A fetal heart rate monitor is an apparatus for observing and recording the heart rate of a fetus and for keeping track of the frequency, length, and strength of the mother's uterine contractions.

2

## Background Facts

In their pleadings, the Wards allege that on January 10, 2006, Carita arrived at UMC complaining of labor pains. The initial examination revealed that her cervix was dilated and nurses attached a monitor to assess the fetal heart rate. Several hours passed until a doctor re-examined her condition. Although her labor had not progressed, Carita requested to be transferred to a labor and delivery room. At 8:10 p.m., Dr. Carol Tracy Suit, TTUHSC's resident physician, examined Carita and also determined that her labor status had not changed. As a result, Dr. Suit informed Carita that she was going to be discharged. Carita, however, requested additional time to see if there would be a change in her condition. Approximately three hours later, Dr. Suit examined Carita for a second time. Observing no change in her labor status, Dr. Suit ordered that Carita be discharged. Carita left UMC at 12:30 a.m. and went home. One day later, on January 12, Carita returned to UMC complaining of labor pains. After numerous attempts, doctors were unable to detect the fetus's heartbeat and the infant was delivered stillborn. Doctors concluded that the ultimate cause of death was a "true knot" in the fetus's umbilical cord. The Wards sued TTUHSC and UMC for negligence.

TTUHSC and UMC filed pleas to the jurisdiction alleging that the Wards' pleading failed to allege that use of tangible personal property caused the death of their unborn son and thus, their suit was barred by sovereign immunity. Following a hearing, the trial court

3

denied the pleas to the jurisdiction. TTUHSC and UMC filed this interlocutory appeal pursuant to § 51.014(a)(8) of the Texas Civil Practice and Remedies Code.

**Standards of Review**

**I. Plea to the jurisdiction.**

When a claim is barred by sovereign immunity, the trial court lacks jurisdiction, and dismissal with prejudice is proper. *City of Austin v. L.S. Ranch, Ltd.,* 970 S.W.2d 750, 752 (Tex.App.–Austin 1998, no pet.). A plea to the jurisdiction is a dilatory plea by which a party challenges a court's authority to determine the subject matter of the action. *Bland Independent School Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We review de novo the trial court's ruling on a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). When reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant. *Miranda*, 133 S.W.3d at 228.

The party suing the governmental entity bears the burden of affirmatively showing that the trial court has jurisdiction to hear the cause. *Tex. Dept. of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). In so doing, we are not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issue raised. *Id.*, citing *Bland Independent School Dist.*, 34 S.W.3d at 555.

4

We are, however, prohibited from considering an expert report as evidence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(k)(1) & (2) (Vernon Supp. 2007).

## II. Sovereign Immunity Under the Texas Tort Claims Act

TTUHSC and UMC are institutions, the status and authority of which are derived from the Constitution of Texas or from laws passed by the Legislature under the Constitution, and as such, they are "governmental units" as defined by section 101.001(3)(D) of the Texas Civil Practices and Remedies Code. *Cox v. Klug,* 855 S.W.2d 276, 277 (Tex.App.–Amarillo 1993, no pet.); *See also Huckabay v. Irving Hosp. Auth.,* 879 S.W,2d 64, 66 (Tex.App.–Dallas 1993, writ dism'd by agr.). As a governmental unit, they are each entitled to the protections of sovereign immunity.[4]

Sovereign immunity protects a governmental unit from lawsuits for damages. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 83 (Tex. 2002). When a claim is barred by sovereign immunity, the trial court lacks subject matter jurisdiction, and dismissal with prejudice is the appropriate remedy. *El Paso Mental Health and Mental Retardation Center v. Crissman,* 241 S.W.3d 578, 581 (Tex.App.–El Paso 2007, no pet.). Section 101.021(2) of the Act provides a limited waiver of sovereign immunity when death

---

[4]Courts often use the terms sovereign immunity and governmental immunity interchangeably; however, they involve two distinct concepts. Sovereign immunity refers to the State's immunity from suit and liability, while governmental immunity protects political subdivisions of the State. *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 693 fn.3 (Tex. 2003). Thus, we will use the term "sovereign immunity" throughout this opinion.

is caused by a condition or use of tangible personal property, if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. *See* § 1.021(2); *Salas v. Wilson Memorial Hosp. Dist.*, 139 S.W.3d 398, 403 (Tex.App.–San Antonio 2004, no pet.). Because the Act provides a limited waiver in certain, narrowly defined circumstances, to come within this exception a claimant must allege that (1) the use or misuse of tangible personal property (2) proximately caused the personal injury or death. *See Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998).

TTUHSC and UMC contend the Wards have failed to demonstrate that the death of their child was caused by the use or misuse of tangible personal property, thereby depriving the trial court of subject matter jurisdiction. The Wards respond with *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983), noting that their facts are squarely on point (use of an electrocardiogram instead of a fetal heart rate monitor) and that it has never been overruled by the Texas Supreme Court. They also rely on several intermediate appellate court decisions in support of their position. *See Texas Tech University Health Sciences Center v. Lucero*, 234 S.W.3d 158 (Tex.App.–El Paso 2007, pet. denied) (applying *Salcedo* on misuse of an abdominal CT scan). *See also University of Texas Medical Branch at Galveston v. Estate of Blackmon*, 169 S.W.3d 712, 721-22 (Tex.App.–Waco 2005) (finding *Salcedo* authoritative in cases involving negligent use or misuse of diagnostic medical equipment), *vacated*, 195 S.W.3d 98 (Tex. 2006); *Baston v. City of Port Isabel*, 49 S.W.3d 425, 428-29 (Tex.App.–Corpus Christi 2001, pet. denied)

6

(acknowledging *Salcedo* is limited to its facts but applying it to analogous case of misuse of electrocardiogram); *University of Texas Medical Branch Hosp. at Galveston v. Hardy*, 2 S.W.3d 607, 609-10 (Tex.App.–Houston [14th Dist.] 1999, pet. denied) (relying on *Salcedo* in hospital staff's failure to properly monitor cardiac monitor).

### Salcedo v. El Paso Hospital District

In *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983), Mr. Salcedo was examined in the emergency room for severe chest pains. An electrocardiogram test showed a classic pattern of myocardial infarction, but Mr. Salcedo was released. *Id.* at 31. After returning home, he collapsed and died from myocardial infarction. *Id.* His widow sued and alleged that hospital employees had misused the electrocardiographic equipment by improperly reading and interpreting the graphs and charts produced by it. The hospital filed special exceptions contending that Mrs. Salcedo had failed to state a cause of action within the waiver provisions of the Act, and the trial court struck her pleadings and dismissed the case. *Id*.

The Supreme Court held that an allegation of defective or inadequate tangible property was not necessary to state a cause of action under the Act if *some* use of the property was alleged to be a contributing factor to the injury. *Id.* at 32. (Emphasis added). It noted, however, that "some condition," required an allegation of defective or inadequate property when it was a contributing factor to the injury. *Id.* It concluded that reading and interpreting are purposes for which an electrocardiogram graph is used in diagnosing

7

myocardial infarction and held that Mrs. Salcedo had alleged her loss was proximately caused by the negligence of the hospital's employees in using tangible personal property. *Id.* at 33.

When *Salcedo* was decided on October 26, 1983, the Act provided for waiver of sovereign immunity for death or personal injuries so caused from *some* condition or *some* use of tangible property . . . ." (Emphasis added).[5]  At that time, the Act also provided, "[t]he provisions of this Act shall be liberally construed to achieve the purposes hereof."[6] However, when the Legislature codified the Act and adopted the Texas Civil Practice and Remedies Code in 1985, two years after *Salcedo,* the word "some" was deleted preceding "condition" and "use."[7]  Additionally, the mandate for liberal construction of provisions of the Act was repealed and not carried forward in the codification.[8]

---

[5]*See* Act of May 28, 1983, 68th Leg., R.S., ch. 530, § 1, 1983 Tex. Gen. Laws 3084, 3085.

[6]*See* Act of May 14, 1969, 61st Leg., R.S., ch. 292, § 13, 1969 Tex. Gen. Laws 874, 877.  The Act's basic purpose was to waive immunity only to a limited degree.  *See Lowe v. Texas Tech University*, 540 S.W.2d 297 (Tex. 1976)*.*

[7]*See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3303.

[8]*See* fn.6 at 3322.

8

## *Salcedo* Distinguished

To distinguish *Salcedo* we must examine significant Supreme Court decisions before and after *Salcedo*, together with intermediate appellate decisions wherein the courts have expressed considerable frustration with the application of the waiver provisions of the Act. We will also address changes in the Act and interpret those changes in light of more recent Supreme Court decisions.

## I. Supreme Court Decisions

The Texas Tort Claims Act was enacted in 1969 to become effective January 1, 1970.[9] The Court decided in *Lowe v. Texas Tech University*, 540 S.W.2d 297 (Tex. 1976), that the plaintiff's allegations pertaining to the failure to use available tangible personal property (protective equipment) were sufficient to invoke the waiver of sovereign immunity provisions of the Act and reversed the Court of Civil Appeals, which had affirmed the trial court's order sustaining pleas to the jurisdiction. Lowe, a football player, alleged among other things, negligence on the part of Texas Tech by failing to furnish proper protective items of personal property to be used as a part of his uniform. *Id.* at 298. The Court held that the allegation brought the case within the statutory waiver of immunity arising from "some condition or some use of personal property." *Id.* at 300.

---

[9]*See* Act of May 14, 1969, 61st Leg., R.S., ch. 292 1969 Tex. Gen. Laws 874, 879, *amended by*, Act of April 11, 1973, 63rd Leg., R.S., ch. 50 § 1, 1973 Tex. Gen. Laws 77.

In a concurring opinion, Chief Justice Greenhill urged a reexamination by the Legislature of sovereign immunity citing the difficulty in ascertaining the legislative intent. *Id.* at 301. Specifically, he was troubled by the section on waiver of immunity where there is personal injury or death caused "from some condition or use" of tangible property. If the waiver provision was intended to be confined to cases involving injury *proximately caused* by some condition or use of property, certain results were reached. (Emphasis added). On the other hand, different results were reached if the Legislature intended the State to be liable in every tort case in which personal property was either used or not used. Justice Greenhill reasoned the latter interpretation would virtually lead to an unrestricted waiver of immunity, which the Legislature could not have intended. *Id.* at 302.

In *Robinson v. Central Texas MHMR Center*, 780 S.W.2d 169 (Tex. 1989), a patient who the defendant's employees knew suffered from epileptic seizures that occasionally caused him to lose consciousness was not supplied with a life preserver and drowned at a lake while under the defendant's care. *Id.* at 170. The plaintiff alleged that MHMR's failure to provide a life preserver brought the case within the purview of § 101.021(2). *Id.* at 169. MHMR alleged that the mere failure to provide a life preserver did not constitute a "condition or use of tangible property" and was not actionable. *Id.* at 170.

Notwithstanding the Court's acknowledgment that the Legislature repealed the original Act and reenacted it with language changes and deletions in 1985, it decided the case under the interpretation set forth in *Lowe v. Texas Tech University*. *Robinson*, 780

10

S.W.2d at 170 n.2 and 171. It reasoned that the Legislature's preservation of the "condition and use" language considered in *Lowe* and *Salcedo* indicated an adoption of the construction given in those cases. Applying *Lowe*, the Court held that the plaintiff stated a cause of action which invoked the waiver of immunity based on the defendant's failure to provide a life preserver. *Id.* In reaching its decision, the Court recognized the "troublesome waiver provision" and called upon the Legislature to clarify the extent to which it intended to waive sovereign immunity. *Id.* at 170.

Five years later, the Court decided *University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175 (Tex. 1994). In *York*, the patient, who was improving from severe injuries he sustained in a car accident that left him partially paralyzed, was admitted to UTMB for an inpatient program. Shortly after his admission, the patient broke his hip which went undiagnosed for approximately eight days. He suffered severe pain, withdrawal, depression, and regression in his rehabilitation.

York sued UTMB and alleged misuse of tangible personal property by "failing to note in [his] medical records" the events of the day he broke his hip and in "failing to memorialize in writing numerous other observations concerning [his] condition . . . ." He further alleged misuse of his medical records by "failing to follow a recommendation noted in the records for an x-ray of [his] hip." A jury returned a verdict in York's favor, which was affirmed by the court of appeals.

11

Recognizing that the codified version of the Act eliminated the mandate for liberal construction and instead called for construction subject to the general principles of statutory construction in § 311.023 of the Code Construction Act, the Court held that mere information, which may or may not be recorded in a patient's medical records, does not constitute use, misuse, or non-use of tangible personal property under § 101.021(2) of the Act. *York*, 871 S.W.2d at 179. York's judgment was reversed and judgment was rendered in favor of UTMB. While paper itself can be touched, handled, and seen, the Court reasoned that medical information recorded on paper is not tangible personal property. *Id* at 176. Information is intangible. *Id.* at 179. York had not alleged any misuse of any hospital device or equipment. *Id.* at 178.

In 1998, the Supreme Court limited *Salcedo* to its facts.[10] *See Dallas County Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339, 342 (Tex. 1998). *Bossley* involved a patient who escaped from a mental health facility, where patients were free to come and go, through unlocked doors and committed suicide by throwing himself in front of a truck. *Id.* at 340-41. The patient's parents sued for wrongful death "caused by a condition or use of tangible personal property," i.e., the unlocked doors to the facility.

The trial court granted summary judgment in favor of MHMR based on sovereign immunity, and the plaintiffs appealed. The appellate court applied *Salcedo* reasoning that

---

[10]*See* Jeff Todd, *Undead Precedent: The Curse of a Holding "Limited to Its Facts,"* 40 Tex. Tech L. Rev. 67 (2007) (regarding the precedential value of an opinion "limited to its facts").

the involvement of "some condition or use of tangible property is enough" for waiver of immunity and reversed the trial court. The Supreme Court reversed the appellate court and rendered judgment that plaintiffs take nothing. In explaining its earlier holding in *Salcedo*, the Court declared that while some involvement of property was necessary, mere involvement, without causation, was insufficient. *Id.* at 342. The Court went on to note that exactly how much more involvement was required was difficult for courts to define. "If only involvement were required, the waiver of immunity would be virtually unlimited . . . ." *Id.* at 343. Requiring only that a condition or use of property be involved would conflict the Act's basic purpose of waiving immunity only to a limited degree. *Id.* (quoting *Lowe*, 540 S.W.2d at 302-03) (Greenhill, C.J., concurring). Property does not cause injury if it does no more than furnish the condition that makes the injury possible. *Id.* The Court found that the patient's death was too attenuated from a use or condition of the doors as to constitute a waiver of sovereign immunity. *Id.*

The Supreme Court requires a nexus between the use of tangible property and the plaintiff's injuries. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542-43 (Tex. 2003) (plaintiff's injuries did not arise from use of the bus, but from the bus driver's failure to supervise the public, which is insufficient to waive immunity under the Act).

The last Supreme Court decision we will examine is *Texas Department of Criminal Justice v. Miller*, 51 S.W.3d 583 (Tex. 2001). In finding that the plaintiff's claim did not fall within § 101.021(2), the Court narrowed application of the Act's waiver provision. *Id.* at

13

588. Miller, an inmate, was treated by TDCJ's staff for nausea and severe headaches. He was given pain medication and other medications for fifteen days, after which he was hospitalized and diagnosed with cryptococcal meningitis, which caused his death. *Id*. at 585. His widow filed suit alleging that Miller's death was caused by misuse of tangible property by (1) improperly administering pain medications and fluids which masked the symptoms of meningitis, (2) improperly reading and interpreting fever-detecting equipment, and (3) improperly using clinic facilities and equipment in diagnosing and treating Miller. She further alleged that TDCJ staff were negligent in "failing to practice medicine in an acceptable manner . . . ," failing to evaluate Miller in a timely manner, failing to make a proper diagnosis, failing to order appropriate laboratory tests, and failing to treat Miller's true condition. *Id*. TDCJ filed a plea to the jurisdiction asserting that Mrs. Miller failed to bring her claim within the waiver provision of the Act and alternatively, filed a motion for summary judgment. The trial court denied TDCJ relief and the court of appeals affirmed. *Id*. at 586.

TDCJ contended in the Supreme Court that Mrs. Miller, in essence, alleged only the non-use of tangible personal property and an error in medical judgment, which do not fall within the statutory waiver. *Id*. at 588. Mrs. Miller responded that not only did she allege failure to use tangible property, but also simultaneous misuse of pain medication and other medications and diagnostic equipment. The Court described her contention as "an attractive attempt to distinguish" non-use cases, but was not persuaded. *Id.*

14

Defining "use" as "to put or bring into action or service, to employ for or apply to a given purpose," the Court noted that while TDCJ did "bring into . . . service" and "employ" various drugs and medical equipment to treat Miller, the mere involvement of some property was not enough. *See id*. at 588. *See also Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996). "Using that property must have actually caused the injury." *Miller*, 51 S.W.3d at 588. Recognizing the problematic distinction it drew, the Court nevertheless concluded that because the property used to treat Miller did not actually cause his death, there was no waiver of sovereign immunity. *Id.* at 588-89.

## II. Significant Intermediate Appellate Decisions

Recently, the Texarkana Court of Appeals, in affirming a trial court's order denying two nurses' motion to dismiss, analyzed § 101.021(2) and discussed contrasting decisions from other intermediate appellate courts. *See Lanphier*, *R.N.*, *v. Avis*, 244 S.W.3d 596 (Tex.App.–Texarkana 2008, pet. filed). In that case, Avis filed a health care liability suit against two nurses alleging negligence in failing to properly carry out their nursing responsibilities. Notwithstanding that a fetal monitor strip showed Avis's fetus to be in distress after she had vomited and had a high fever, her labor was allowed to proceed for eight hours. After the nurses were unable to locate a fetal heart tone, a cesarean section surgery was performed and Avis's baby was delivered stillborn.

In reviewing this Court's opinion in *Clark v. Sell*, 228 S.W.3d 873 (Tex.App.–Amarillo 2007, pet. filed), in which we held that suit could not be maintained under any available

waiver provision of the Act, the Texarkana Court of Appeals noticed the importance of the absence of a nexus between the use of tangible personal property and the injury sustained. *Lanphier*, 244 S.W.3d at 602.

*Kelso v. Gonzales Heathcare Systems*, 136 S.W.3d 377 (Tex.App.–Corpus Christi 2004, no pet.), involved delayed treatment following results of an EKG which indicated the patient was having a heart attack. The plaintiff alleged that the delay in treatment caused permanent injuries and the injuries were caused by misuse of the EKG machine. *Id.* at 380. The court concluded that the patient's allegations did not bring the claims within the waiver provisions of the Act because the plaintiff had not made an affirmative allegation that the EKG machine was incorrectly used or that its results were erroneous. *Id.* 382. The court reasoned that misuse of information produced by the EKG machine caused the injuries rather than misuse of the device itself. *Id.*

By contrast, in *University of Texas Medical Branch Hosp. at Galveston v. Hardy*, 2 S.W.3d 607, 609-10 (Tex.App.–Houston [14th Dist.] 1999, pet. denied), a cardiac monitor alarm indicated heart stoppage, but resuscitation efforts were not commenced until at least five minutes after the first alarm. *Id.* 608-09. The patient suffered severe brain damage and was eventually removed from life support systems. The plaintiff sued for wrongful death alleging the hospital staff failed to properly oversee the monitor. The court relied heavily on *Salcedo* and concluded that the use of the cardiac monitor, like the EKG,

directly affected and impacted the person whose heart condition was being monitored. *Id.* at 610.

In recognizing conflicting results, the Court in *Lanphier* was persuaded by the reasoning in *Kelso* and *Clark,* finding that the substance of Avis's allegations did not concern use of tangible property but were more akin to misuse of information provided by the monitor, which is not considered tangible property under the Act. The court quoted from *Turner v. Zellers*, 232 S.W.3d 414 (Tex.App.–Dallas 2007, no pet.):

> the mere use of tangible personal property by Dr. Zellers in connection with his diagnosis and treatment of [patient] does not mean the State has waived sovereign immunity for any health care liability claim arising from that diagnosis and treatment. To hold otherwise would render a governmental unit subject to suit any time a physician employed by it picked up a tongue depressor and examined a patient.

Four years after *Hardy*, the San Antonio Court of Appeals found that *Salcedo* was no longer controlling in a case involving the use of an electrocardiogram. *See Anderson v. City of San Antonio*, 120 S.W.3d 5 (Tex.App.–San Antonio 2003, pet. denied). In that case, emergency medical technicians were dispatched to Anderson's home because he was suffering from severe chest pains. *Id.* at 6. Two electrocardiogram tests were performed, and the EMTs determined that Anderson did not need to be taken to the hospital. *Id.* Later that day, Anderson again suffered chest pains and EMTs were dispatched to his home. This time, he was transported to the hospital where he died that night. *Id.*

Relying on *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540 (Tex. 2003), the San Antonio Court of Appeals concluded that Anderson's death was caused by his cardiac condition and the EMTs' alleged negligence, and not by use of the electrocardiogram machine. *Anderson*, 120 S.W.3d at 9.

## III.  Statutory Construction

We acknowledge that in 1985, a legislative comment following the Act stated that the "Act [was] intended as a recodification only, and no substantive change in the law [was] intended . . . ."[11]  However, comments following code provisions, while instructive, are not law. *Fetter v. Wells Fargo Bank Texas*, *N.A.*, 110 S.W.3d 683, 687 (Tex.App.–Houston [14th Dist.] 2003, no pet.); *Lockhart Sav. & Loan Ass'n v. RepublicBank Austin*, 720 S.W.2d 193, 195 (Tex.App.–Austin 1986, writ ref'd n.r.e.).  Thus, a legislative comment cannot be construed as altering clear and unambiguous language of a statute.

Courts take statutes as they find them.  *RepublicBank Dallas*, *N.A. v. Interkal*, *Inc.*, 691 S.W.2d 605, 607 (Tex. 1985) (quoting *Simmons v. Arnim*, 110 Tex. 309, 220 S.W. 66, 70 (1920)).  When construing a statute, every word, phrase, and expression is read as if it were deliberately chosen, and we presume the words excluded from a statute were done so purposefully.  *See Cameron v. Terrell & Garrett*, *Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).  *See also Mid-Century Ins. Co. v. Texas Workers' Compensation Com'n*, 187 S.W.3d 754,

---

[11]*See* fn.7 at 3322.

18

758 (Tex.App.–Austin 2006, no pet.); *Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex.App.–Austin 2002, pet. denied).

The word "some," which was excluded from § 101.021(2) by the Legislature in 1985, means: being an unknown, undetermined, or unspecified unit or thing. *Webster's New Collegiate Dictionary* 1099 (1981). When *Salcedo* was decided, "use" and "condition" were both modified by the word "some." Under the holding in *Salcedo*, an allegation of "some use" of tangible property was sufficient if the property was alleged to be a contributing factor. Years later, the Court in *Miller* concluded that mere involvement of "some" property was not enough to fall within the waiver provision. 51 S.W.3d at 588. Instead, using the property must have actually caused the injury. *Id.* Unlike the "failing to" allegations in *Lowe v. Texas Tech University*, which was decided under the Act when the word "some" modified use and condition, Mrs. Miller's allegations, which were couched in terms of "failing to," were found insufficient to demonstrate a waiver of sovereign immunity.[12]

---

[12]We recognize that *Robinson*, which was decided in 1989 after the changes to the Act, also involved "failing to" allegations. The Court, however, based its decision on the preservation of "condition and use." Later decisions have, however, narrowed or limited *Salcedo.*

## Analysis

## I. Application of § 101.021(2) to the Wards' Claim

Considering the similarity of the arguments raised by TTUHSC and UMC, we will address their issues simultaneously. Under § 101.021(2) of the Act, a governmental unit waives sovereign immunity for death (1) caused by (2) a condition or use of tangible personal property. We first turn to an examination of the Wards' pleadings and relevant jurisdictional evidence to determine whether their claims fall within the limited waiver of sovereign immunity. At the time of the hearing on the pleas to the jurisdiction, the Wards had filed their Fourth Amended Petition. They alleged that UMC, through its nurse, was negligent as follows:

> a. [m]isuse of the external fetal monitor attached to Carita Ward by failing to recognize and respond to a non-reassuring heart rate pattern of her fetus;
>
> b. [n]on-use of the external fetal monitor attached to Carita Ward by failing to recognize and respond to a non-reassuring heart rate pattern for her fetus.

They further alleged that the "misuse and non-use of the fetal heart rate monitor was a foreseeable and proximate cause of injuries and damages . . . ."

As for TTUHSC, the Wards alleged negligence by its resident physician, Dr. Carol Tracy Suit, as follows:

> a. [n]on-use of the external fetal heart rate monitor to access the status of the unborn child before ordering Carita Ward discharged;

20

b. [m]isuse of the external fetal heart rate monitor by failing to recognize and respond to a non-assuring heart rate pattern of Carita Ward's fetus;

c. [n]on-use of the external heart rate monitor by failing to recognize non-assuring fetal heart rate patterns prior to discharging Carita Ward.

They further alleged that Dr. Suit's negligence was "a foreseeable and proximate cause of injuries and damages . . . ."

In support of their pleading, the Wards attached expert reports[13] and deposition excerpts from a nurse employed by UMC. The limited excerpts show that the nurse responsible for Carita was a recent graduate with only four and one-half months experience. She testified that it was her job to notify the physician if she felt there were non-reassuring signs on the tracings from the external monitor.

UMC filed its plea to the jurisdiction alleging that the Wards had not raised claims that fell within the limited waiver of sovereign immunity under the Act. To support its plea, UMC attached Carita's sealed medical records. Those documents establish that there was a "tight true knot" in the umbilical cord. TTUHSC filed its plea to the jurisdiction after being added as a defendant by the Wards' Third Amended Petition and also filed a supplemental plea to the jurisdiction after the Wards filed their Fourth Amended Petition. It asserted that the Wards had failed to allege adequate grounds for waiver of sovereign immunity.

---

[13]As previously noted, we are prohibited from considering expert reports in the underlying proceeding, even for the purpose of determining jurisdiction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(k).

During the hearing on the pleas to the jurisdiction, defense counsel for UMC argued that the "non-use" paragraph of the Wards' allegations against UMC be stricken. *See Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996) (non-use of tangible personal property does not fall under the waiver provisions of the Act). *See also Kassen v. Hatley*, 887 S.W.2d 4, 14 (Tex. 1994) (non-use of property does not trigger waiver of sovereign immunity under the Act). In response, counsel for the Wards suggested that "non-use" and "misuse" were a matter of semantics and offered to amend the Wards' pleadings. The trial court replied, "[a]ll right." Three days after the hearing, the Wards filed their Fifth Amended Petition alleging only misuse of the external fetal monitor against UMC and TTUHSC and eliminating any "non-use" paragraphs. A month after the Fifth Amended Petition was filed, the trial court signed its order denying the pleas to the jurisdiction.

At first glance, the Wards' allegations that TTUHSC and UMC were negligent in misuse of the external fetal heart monitor seem to fit under the Court's analysis in *Salcedo* that "some" use of tangible personal property was involved. However, the Wards also alleged that TTUHSC and UMC were negligent in "failing to recognize and respond to a non-assuring heart rate pattern of Carita Ward's fetus."

In conducting a de novo review, we conclude the following: *Salcedo* was decided under the pre-codified version of the Act which called for liberal construction of the waiver

22

provisions. Since then, the mandate for liberal construction has been repealed.[14] Additionally, the Supreme Court has interpreted the limited waiver provisions of the Act more narrowly. Intermediate appellate courts have struggled with the waiver provisions of the Act resulting in conflicting decisions. However, given the Legislature's post-*Salcedo* changes to the Act in 1985, i.e., deletion of the word "some" before use and condition, elimination of the mandate to liberally construe the waiver provisions, and given the Supreme Court's trend to limit *Salcedo* and narrowly apply § 101.021(2) to cases involving a causation nexus between the use of tangible property and complained of injury or death, we hold the Wards have not demonstrated that "use" of the fetal heart rate monitor caused their injury. They did not allege that the monitor was incorrectly used or that its results were erroneous. Rather, they couched their allegations as "failing to recognize and respond," which are allegations of misuse of information and negligence by medical staff. They have also failed to establish a nexus between use of the monitor and the stillborn birth of their child. Additionally, the evidence indicates that the cause of death was a true knot in the umbilical cord. Resultantly, the Wards have failed to state a claim under § 101.021(2) of the Act. The two issues presented by TTUHSC are sustained and the three issues raised by UMC are likewise sustained.

---

[14] *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3322.

## II. The Wards' Opportunity to Amend Pleadings

When a plaintiff fails to plead facts that establish jurisdiction, but the petition does not demonstrate incurable defects, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *See Miranda*, 133 S.W.3d at 226-27. *See also County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Brown*, 80 S.W.3d at 555. Despite having failed to affirmatively plead facts establishing jurisdiction, the Wards were afforded an opportunity to amend their Fourth Amended Petition after the hearing on the pleas to the jurisdiction. By their Fifth Amended Petition, they deleted the "non-use" paragraphs and alleged only misuse of the external fetal heart monitor. Practically speaking, the Wards have already had an opportunity to replead to no avail. A plaintiff should not be permitted to relitigate jurisdiction once that issue has been finally determined. *See Harris County v. Sykes*, 136 S.W.3d 635, 639 (Tex. 2004). Thus, we are required to render the judgment the trial court should have rendered. Tex. R. App. P. 43.3.

## Conclusion

Consequently, the trial court's order denying Texas Tech University Health Sciences Center's and University Medical Center's respective pleas to the jurisdiction is reversed. Rendering the judgment the trial court should have rendered, we grant Texas Tech

24

University Health Sciences Center's and University Medical Center's pleas to the jurisdiction and dismiss Carita Elizabeth Ward and Dustin Ward's claim for want of jurisdiction.


Patrick A. Pirtle
Justice


Quinn, C.J., not participating.